UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CR00295 DJS (AGF) |
| | ) | |
| KENDRICK DARNELL MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant,

Kendrick Darnell Moore.  Pretrial matters were referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress

statements and a motion to suppress evidence.  (Doc. Nos. 20 & 21).  An evidentiary

hearing was held on June 20, 2006.  The government was represented by Assistant United

States Attorney Raymond M. Meyer.  Defendant was present and represented by his

attorney, Nick A. Zotos.

At the hearing, the government presented the testimony of Detective Thomas

Noonan, a detective in narcotics who has been employed with the St. Louis County

Police Department (SLCPD) since 1997 and was previously employed as a police officer

with the City of St. Louis; Detective Robert Tubbe, also employed with SLCPD; and

Special Agent (SA) Aaron Ackland, employed with the Federal Bureau of Investigation

and assigned to the Most Violent Offenders unit. Defendant presented the testimony of Lakita Moore and Corteema Berry-Hill, Defendant's sisters, and Lolita Rene Berry-Hill Johnson ("Ms. Berry-Hill"), Defendant's mother. The witnesses were all cross-examined extensively by opposing counsel. Trial is scheduled for August 7, 2006. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On the evening of April 12, 2006, detectives with the St. Louis County Street Enforcement Team, also known as the Street Corner Apprehension Team ("SCAT"), were working in the area near the 1100 block of Riaza Square. Generally this unit would go to an area where there had been prior narcotics arrests or citizen complaints and attempt to make an undercover buy and arrest. This process would typically involve approximately 10 detectives. Two detectives working undercover would attempt to make a purchase. One or more detectives would be assigned to primary surveillance, responsible to maintain surveillance of the undercover officers, and there would be arrest teams and two supervisors. On this particular evening, Dets. Flanagan and Stenger were working undercover, attempting to make a purchase, and Det. West was assigned to primary surveillance, responsible to maintain surveillance on the undercover officers. Dets. Noonan and Chris Klein were assigned as part of the arrest unit, to arrest anyone from whom a purchase was made, and they and others were stationed in vehicles in the

vicinity.  Det. Flanagan was wearing a kel wire, which permitted the other detectives to hear and monitor his actions.

At some time near 9:30 p.m. that evening, Det. Flanagan advised the officers that he was going to approach an individual at Larimore and Riaza Square about a purchase. This individual was later identified as Ronnie Tucker.  Det. Noonan and the other officers were able to hear Det. Flanagan's conversation over the kel wire.  The undercover officer, who had marked currency, approached Tucker and asked if he could by a "50," referencing $50 of crack cocaine.  Tucker responded that he could take care of that, and that he had a guy on Green Valley with all of the good stuff.

Tucker got into the vehicle with Dets. Flanagan and Stenger, and they drove to the lot of a Phillips 66 station at Chambers and Green Valley.  In the meantime, Det. Noonan and the other members of the unit set up surveillance in the area.  Tucker wanted Det. Flanagan to front the money for the purchase, and he finally agreed.  Tucker said he needed to walk down the street, but would not otherwise identify the address.  Tucker left the car, and Det. Noonan observed him go to a residence at 10041 Green Valley (the "Residence"), and perhaps knock.  He could not see who opened the door.  This was at approximately 9:30 p.m.

Approximately 30 minutes later, near 10:00 p.m., Dets. Noonan and Klein observed two black males leave the Residence, driving a black SUV.  They later learned that one of the two individuals was Terry Johnson, Defendant's stepfather and Ms. Berry-Hill's husband.  Because it was dark and his car windows were tinted, Det. Noonan was

unable to determine at the time whether Tucker was one of the individuals who left in the SUV.  The detectives thought they might be going to complete the drug transaction, but the SUV drove past the location where Det. Flanagan was waiting.  Because of this, Det. Noonan believed that Tucker might not have been in the vehicle.  Although members of the unit followed the SUV, they lost contact with the vehicle at some point.

At approximately 10:35 p.m., the black SUV returned to the Residence.  There was one black male inside, and he got out of the vehicle and entered the Residence.  He stayed at the residence for several minutes, and then left again, driving toward Chambers.  Dets. Noonan and Klein followed him across Chambers, but thereafter either lost sight of him or discontinued their surveillance.

After discussing the matter, Sergeant Cunningham and Det. Noonan decided to return to the Residence to try to find Tucker.  They suspected that perhaps he was attempting to keep their money, and that he might be in the Residence "smoking up" the buy money.  They approached the Residence at 10041 Green Valley and knocked on the door.  They were both wearing their badges and blue jerseys that had "St. Louis County Police" in yellow letters, and both were wearing sidearms.

Ms. Berry-Hill, who lived at the Residence, answered the door.  They advised her that they were conducting a narcotics investigation and had observed a male enter the Residence.  She responded that the only male was her husband, Terry Johnson, and that he had just left and would be returning.  They asked for permission to search the Residence, and she said "okay."  At the time, there were only two officers present, and

4

they did not make any threats or promises to induce her consent to search. Ms. Berry-Hill appeared to be alert, and did not appear to be under the influence of any drugs or alcohol, and her answers were responsive.

On the first floor of the Residence, the detectives saw two females in their mid-teens, later identified as Lakita Moore, age 17, and her younger sister, Corteema Berry-Hill. In the basement, Det. Noonan saw a bedroom with an open door. Defendant Kendrick Moore was inside the bedroom. As Det. Noonan was beginning to advise him they were looking for an individual regarding an attempted narcotics sale, he observed on the dresser a Pyrex bowl, two Pyrex measuring cups that appeared to have a white, powdery residue, a plate with chunks of off-white powder that appeared to be crack cocaine, a razor blade, two scales, and a bag of what appeared to be marijuana. Based on his experience, he knew that the items he observed were commonly associated with drug sales.

Det. Noonan advised Defendant that he was under arrest for the possession of narcotics. He advised Defendant of his rights under Miranda from a card that he keeps with him, and the witness read those rights into the record as he had read them to Defendant. Defendant stated that he understood his rights. He also said that he did not live at the Green Valley Residence. Det. Noonan, however, observed mail addressed to Defendant on the dresser. Defendant was searched incident to his arrest, and in his pocket Det. Noonan located a large amount of currency and some keys, and perhaps a cell phone. Det. Noonan advised the other detectives of his arrest by radio, and some of the

other detectives from the SCAT unit arrived at the Residence. Two of them came to the basement to secure Defendant, who was brought upstairs in handcuffs and seated in the living room.

In the meantime, Dets. Noonan and Tubbe and Sgt. Cunningham decided to return to the area around Green Valley and Chambers to look for Johnson. Det. Tubbe was dressed in the same manner as Det. Noonan. At approximately 11:00 p.m., Sgt. Cunningham advised by radio that he saw Johnson pull onto the same Phillips 66 lot where Det. Flanagan had been left waiting for Tucker. As the detectives exited their cars, Sgt. Cunningham approached and announced their identity. Johnson got out and ran toward the rear of his car, and the officers pursued him on foot. As he was running, Johnson threw an object to the ground, which was retrieved by Det. Tubbe. It was a plastic bag with several off-white chunks that appeared to be crack cocaine. Johnson slipped on the gravel, and Det. Noonan caught up with him and placed him under arrest for possession of a controlled substance.

Johnson was advised of his rights under <u>Miranda</u> and advised that he did not have to make a statement. No threats or promises were made to induce Johnson to waive his rights and make a statement. He did not smell of alcohol, and Det. Tubbe did not observe anything about Johnson's demeanor to suggest he did not understand what was transpiring. When asked why he had run from the officers, Johnson said there were active warrants for his arrest. They asked him if he lived at the Green Valley Residence, and he said yes. They asked if he had anything illegal there, and he said no. They asked

if they could search the Residence, and he agreed. At the Phillips 66 lot, Johnson signed a consent to search form permitting a search of the Residence. <u>See</u> Ex. A to Doc. No. 23. No promises or threats were made to induce Johnson to sign the consent. The Consent to Search form signed by Johnson permitted a search of the interior of the "Residence at 10041 Green Valley Dr., for crack cocaine, Department buy money, any illegal narcotics and contraband or weapons." The time reflected on the form was 11:15 p.m.

Dets. Noonan and Tubbe and Sgt. Cunningham drove Johnson back to the Residence. Det. Wally and another detective were still there with Defendant when they arrived. The detectives walked through the front door and met Ms. Berry-Hill inside. They advised her they had arrested her husband for possession, and that he had given them a consent to search the residence. She asked whether they had a search warrant, and they said no, but that they had Terry Johnson's consent. She asked to see the consent form, and it was shown to her. After she read the consent form, she returned it to the detectives and told them they could search whatever they wanted. She did not state that Johnson did not live there, nor did she object to the search.

The detectives then proceeded with a more methodical search of the Residence. In the common area of the basement, outside the bedroom, the detectives located three pistols in cases under a couch. They also located a safe against the opposite wall of the common area. Recalling that Defendant had an unusual key on his key ring, the detectives met with Defendant and asked him if it was his safe, and he said, "yes." They asked him if he would open the safe, and he agreed, but he said he could not remember

the combination, and that it might take a few minutes.  Defendant asked if they would go outside with him, and Dets. Noonan and Tubbe took him outside.  Once outside, Defendant told the detectives that he knew he was in trouble, but that his mother and sisters had nothing to do with what was in the house.  They advised him that they were not interested in his mother or his sisters.

They returned inside, and after several tries Defendant was able to open the safe.  Inside was a large amount of currency, several bricks of cocaine, and some cocaine base.  The Detectives also located two or three more cell phones in the bedroom, near where the paraphernalia had been located earlier, and these cell phones were also seized.[1]  The detectives returned Defendant's keys and did not seize them.  The safe was photographed but also was not seized.  The Detectives contacted the FBI to assist with the case, and the FBI was advised of the amount of the narcotics, and that there were handguns and drug paraphernalia at the house.

In the meantime, the exact timing of which was not identified at the hearing, Dets. Flanagan, West, and Stenger returned to the location where they had originally picked up Ronnie Tucker, and found him there.  They placed him under arrest, and in a search incident to his arrest they located $20 of the buy money.

Ronnie Tucker, Terry Johnson, and Defendant Moore were all taken to the 1st Precinct.  Dets. Noonan and Tubbe took Defendant to a small interview room.  He was

---

[1] Defendant confirmed at the hearing that he is not challenging the subsequent search of the cell phones that took place pursuant to a federal search warrant.

seated at a table, and was probably was handcuffed to the table. Det. Tubbe advised Defendant of his <u>Miranda</u> rights for the second time from a card he kept with him. Defendant said he understood his rights. He appeared to understand the questions that were asked of him, and his answers were responsive. He did not appear to be under the influence of any drugs or alcohol. No promises or threats were made to induce Defendant to waive his rights. At the beginning of the interview, he stated that he needed a minute to clear his head, and then stated that he would "keep real" and wanted Detective Tubbe to "keep real." Defendant advised the detectives that none of the drugs at the Residence belonged to his mother or sisters; he said they were not involved.

Defendant stated that he got the drugs from an individual identified as "J," whom he described. He initially stated that he had paid $100,000 for the drugs, but later said the drugs had been fronted to him. Defendant stated that he got the firearms from an unknown person in St. Louis City. Defendant stated that the guns were "clean," that "there were no bodies on them," and that they were not stolen. He denied ever carrying the firearms on his person. With regard to the money in the safe, Defendant stated he believed there was between $25,000-$30,000, but that he had never counted it. It was later counted by the detectives and determined to be more than $42,000. Defendant admitted that the funds were the proceeds from the sale of cocaine. When the detectives advised Defendant that the money was subject to forfeiture, he said his mother needed some of the money to pay bills. The detectives advised him that they could not help him with that. Throughout the interview, Defendant's demeanor was calm and cooperative.

He did not at any time request a lawyer.

Det. Tubbe booked Terry Johnson. There were several warrants outstanding for his arrest. Det. Tubbe recalled that with regard to some of Johnson's prior arrests, the Green Valley Residence was listed as his residence address. He did not access Johnson's records with the Department of Revenue.

At approximately 1:30 a.m. on April 13, 2006, SA Ackland and SA Craig Severson from the FBI arrived at the Residence and took custody of the drugs, the guns, and the other evidence. When they arrived, there were approximately six police officers in the house, and Ms. Berry-Hill appeared to be asleep on the couch. She lifted her head when the agents identified themselves and said, "It's about time," further stating that she had to work in the morning. Ms. Berry-Hill did not complain to the agents about anything that had transpired the prior evening. SA Severson prepared an inventory of what had been seized, which they thereafter presented to Defendant Moore. Defendant signed the inventory and stated that he knew what had been seized.

The morning after the incident, Ms. Berry-Hill went to the St. Louis County Police Department and filed a complaint with Internal Affairs. Two days after the incident, SA Ackland and another agent returned to the Residence to serve a grand jury subpoena on Ms. Berry-Hill.[2] They identified themselves as agents of the FBI. Ms. Berry-Hill stated at

---

[2] Ms. Berry-Hill retained an attorney who advised the government that she would invoke her Fifth Amendment rights before the grand jury. On this basis, she was not required to appear before the grand jury.

that time that the officers did not have consent to search the Residence on the night in question. She stated that when she asked to see the consent by Johnson, she advised the detectives that Johnson stayed at the Residence but did not live there, and that she told the detectives to stop the search. With regard to Defendant Moore, Ms. Berry-Hill advised the agents that he occasionally stays at the Residence. The agent gave her the name of the Assistant United States Attorney assigned to the case, if she wanted to pursue the matter further. He did not recall Ms. Berry-Hill advising him that she had filed a complaint with the St. Louis County Police Department. SA Ackland was asked to run a printout concerning Terry Johnson in connection with the hearing, and as of May 2006, Johnson was listed with Probation and Parole as living at the Residence. He did not contact the probation officer to further discuss Johnson's residence address.

Defendant's mother, Lolita Berry-Hill Johnson, and his two sisters testified on his behalf at the hearing. They testified, essentially, as follows: The police knocked on the door, and when Ms. Berry-Hill opened the door, the police barged in and began searching without asking any permission. Ms. Berry-Hill repeatedly asked them to leave, and she testified that she never provided permission to search for persons or for drugs. They further testified that Defendant Moore had come to the house to visit shortly before the police arrived. He was sitting in the kitchen when the police arrived, and the officers came into the kitchen, immediately placed Defendant in handcuffs, without any explanation, and took him outside. They further testified that they were required to stay in the living room for approximately the next four hours, and that Defendant Moore was

never again brought inside the Residence.

With regard to Terry Johnson, all three witnesses admitted that he stayed at the house about three times a week, but all stated that he did not have a key to the house. Ms. Berry-Hill testified that at one point while she was telling the officers to leave and that they had no right to be in the house, one of the officers said, "Wait a minute," and then left the house. A few minutes later he returned to the house, flashed a paper at her that had Mr. Johnson's signature on it, and said, "Now I've got the right," indicating that Terry Johnson signed a consent. She said she was unable to see anything on the document other than Terry Johnson's signature. She testified that Terry Johnson did not live there and had no right.

To the extent the testimony of Defendant's mother and sisters differs from that of the officers, the Court credits the testimony of the officers. On certain topics, the testimony of these three witnesses appeared to be rehearsed, and Ms. Berry-Hill's bias during her testimony was obvious. Moreover, the testimony of the three witnesses was fraught with inconsistencies and was at times illogical. Highlighting just a few examples, Lakita Moore said she was not in her bedroom that evening and was in the area around the kitchen and hallway, but that she never saw her father come in that evening; she only saw him earlier in the day. Her sister, however, testified that she saw her father come by that evening, and that her sister, Lakita Moore, was located where she would have seen her father at the time. Ms. Berry-Hill likewise testified that Terry Johnson came by to borrow her car.

Defendant's sisters testified that when the police barged in, they said they were looking for "Terry," and just kept saying over and over, "Where's Terry?" Defendant's mother said they barged in and said they were looking for the "dude in the black Blazer." Of course, the police had no reason even to know Terry Johnson's name at this point in their investigation.[3]

Lakita Moore testified that after the police arrived, they were forced to remain in the living room for hours, and that she and her sister never went into their bedrooms. While her sister, Corteema Berry-Hill, said the same on redirect, on cross-examination she stated that after the police arrived, they told her and her sister to go back in their rooms, and that they stayed there while their mother stayed in the living room. This is consistent with the officers' testimony. And though Lakita Moore testified that she and her sister were never in their bedrooms while the police were there, Corteema Berry-Hill volunteered on cross-examination that the officers searched her bedroom only once, and that "they just looked around and didn't search the closet or anything." Of course, she could only know that if she was in her bedroom. Ms. Berry-Hill also testified that Defendant never stayed at the Residence, but Corteema Berry-Hill admitted that Kendrick Moore sometimes stayed at the Residence, but said he did not sleep in the basement.

---

[3] The Detectives also had no reason immediately to arrest Defendant without asking any questions. The person they were looking for was Tucker. And they had no particular incentive to try to attribute the narcotics located in the Residence to Defendant Moore, rather than Johnson. Both had prior narcotics convictions, and they had observed Johnson enter and leave the Residence and in possession of other narcotics.

Defendant's sisters also testified, somewhat incredibly, that they had no idea what was in the basement; Lakita Moore testified that they were not allowed in the basement and that she had no idea that there was a safe in the basement.  Ms. Berry-Hill testified that the safe was in the basement when they moved there, and that everybody, including her ex-boyfriend, could open the safe.  Her further testimony regarding how the safe opened, how she opened the safe, and the location of the key to the safe was wholly unbelievable.  And though all three witnesses at times testified they were forced to stay in the living room the entire time, and though Ms. Berry-Hill testified she never slept during that time, none of the witnesses ever saw Defendant come back into the house to open the safe, and none of them ever observed the police remove any evidence from the Residence. Having observed the witnesses and carefully reviewed the testimony, the Court is simply unable to believe the testimony of Defendant's mother and sisters.

## CONCLUSIONS OF LAW

### A.  <u>Initial Consent to Search the Residence</u>

On these facts, it is not at all clear that Defendant possesses a sufficient privacy interest to challenge the search of the Green Valley Residence.  A defendant moving to suppress evidence has the burden to show that he has a legitimate expectation of privacy in the area or object searched.  <u>United States v. Pierson</u>, 219 F.3d 803, 806 (8th Cir. 2000); <u>United States v. Gomez</u>, 16 F.3d 254, 256 (8th Cir. 1994).

> "Factors relevant to the determination of standing include:  ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the

14

circumstances surrounding the search; the existence or nonexistence of a
subjective anticipation of privacy; and the objective reasonableness of the
expectation of privacy considering the specific facts of the case."

Pierson, 219 F.3d at 806. Elsewhere, the Eighth Circuit has described the analysis as a

two-part test that requires the defendant to show both (1) a subjective expectation of

privacy and (2) that the expectation is objectively reasonable, or "one that society is

willing to accept." United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999); accord

United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994). Among the facts relevant to the

showing are "whether the party has a possessory interest in the things seized or the place

searched; whether the party can exclude others from that place; whether the party took

precautions to maintain the privacy; and whether the party had a key to the premises."

McCaster, 193 F.3d at 933.

Following his arrest, Defendant advised the detectives that he did not live at the

Residence, and he apparently continues to take that position.   If Defendant's assertions

are correct, he would not have a sufficient privacy interest to challenge the search of the

Residence. McCaster, 193 F.3d at 933.

Assuming for purposes of the hearing that Defendant did live at the Residence, or

stay there frequently enough to have a privacy interest, the detectives were authorized

initially to search the apartment based on Ms. Berry-Hill's consent.

It is the prosecution's burden to prove by a preponderance of the evidence that a

consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir.)

cert. denied, 519 U.S. 1011 (1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir.

1994).  A consent is voluntary if it is the product of free choice, the individual's will is not overborne, and the consent is not given under coercion or duress.  In determining whether the prosecution has met its burden, courts look to both the characteristics of the person giving the consent and the details of the environment in which the consent was given. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974).  The factors to be considered in determining whether consent is voluntary include:  (1) the individual's age; (2) the individual's general intelligence and education; (3) whether the individual was under the influence of drugs or alcohol; (4) whether the individual was informed of his or her Miranda rights prior to the consent; and (5) whether the individual had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.  United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005); accord United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002); Chaidez, 906 F.2d at 381.  Among the factors to be considered in examining the environment surrounding the consent, courts examine:  the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred.  United States v. Smith, 260 F.3d 922, 924 (8th Cir.

2001); Chaidez, 906 F.2d at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

At the time of these events, Ms. Berry-Hill was an adult and the parent of her own children. She did not appear to be under the influence of drugs or alcohol and appeared to understand what was going on. She was not under arrest at the time and had no reason to believe that she, personally, was the target of any investigation. At the time there were only two Detectives at the scene, neither of them displayed their firearms, and no threats or promises were made. Under all of these facts and circumstances, the Court finds that Ms. Berry-Hill's first consent to search was in fact voluntary.

**B.  Arrest of Defendant Moore and Seizure of Items at Time of Arrest**

Based on the consent provided by Ms. Berry-Hill, the Detectives were authorized to search the Residence for Ronnie Tucker. They did not exceed the scope of that search by entering the bedroom in the basement. When they entered the bedroom and began to speak to Defendant Moore, they observed what appeared to be narcotics and narcotics-related paraphernalia on the dresser. Inasmuch as the narcotics and paraphernalia were in plain view and their incriminating character was immediately apparent, the items were subject to seizure. Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir. 2003); United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001); United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997). Given Defendant's presence in the bedroom where the contraband was located, in plain view, the Detectives also had probable cause to place him

under arrest.   Maryland v. Pringle, 540 U.S. 366, 372-73 (2003); United States v.
Velazquez-Rivera, 366 F.3d 661, 664-65 (8th Cir. 2004).

Following Defendant's lawful arrest, the Detectives were authorized to search
Defendant incident to his arrest, and therefore were authorized to seize the currency, keys
and other items located on his person.  See New York v. Belton, 453 U.S. 454, 458-59
(1981); United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Pratt, 355
F.3d 1119, 1121, 1124 (8th Cir. 2004).

**C.  Second Search of the Residence**

After Terry Johnson was arrested, he gave the Detectives written consent to search
the Residence on Green Valley.  Valid consent to search may be given by a party "who
possessed a common authority over or other significant relationship to the premises or
effects sought to be inspected."  Matlock, 415 U.S. at 171.  See United States v. Richard,
994 F.2d 244, 250 (5th Cir. 1993) (co-occupant of a motel room had authority to consent
to a search of a room she had been staying in for several days).  The absence of any legal
ownership interest in the premises is not controlling.  In general, any person who has a
reasonable expectation of privacy in the place to be searched, any person with common
authority over the premises or other sufficient relationship to the place or the effects being
searched, can give valid consent.  Matlock, 415 U.S. at 171.

Even if the consenting party lacked actual authority to give valid consent to search,
official reliance on the consent may validate the search if it was reasonable for the law
enforcement officers to believe the consenting party had the required relationship to or

authority over the premises.  Illinois v. Rodriguez, 497 U.S. 177, 187-188 (1990);

Alcantar, 271 F.3d at 738;  Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994).

"The relevant inquiry is whether the facts available would have justified a reasonable

officer in the belief that the consenting party had authority over the premises."  Matlock,

415 U.S. at 171.  The test for measuring the scope of the consent is also one of objective

reasonableness, "what would the typical reasonable person have understood by the

exchange between the officer and the individual."  Adams, 346 F.3d at 1171 (reasonable

to believe from actions of defendant's girlfriend that she provided consent to search

residence).

On these facts, the Court finds that Johnson had authority to authorize the search of

the Residence.  He advised the Detectives that he lived at the Residence.  He was Ms.

Berry-Hill's husband, he stayed at the Residence on a regular basis, and had stayed at the

Residence the night before.  Ms. Berry-Hill, who also identified Johnson as her husband,

acknowledged that he had just left the Residence and would be returning.  Ms. Berry-Hill

admitted that there was no place within the Residence where Johnson was not permitted to

go.  Johnson had also provided the Green Valley address as his residence in connection

with prior arrests.  Govt. Ex. C.  See United States v. Adams, 346 F.3d 1165, 1170-71 (8th

Cir. 2003); United States v. Denberg, 212 F.3d 987, 992 (7th Cir. 2000) (girlfriend who

lived at residence had actual authority to consent to search entire residence, including

locked gun cabinet, where girlfriend had access to cabinet); United States v. Hall, 979

F.2d 77, 79 (7th Cir. 1992) (owner of home in which tenant rented room had authority to

consent to search of tenant's room where homeowner owned furniture, door not locked, and homeowner had access to room).  Although Defendant asserts that Ms. Berry-Hill refused consent and advised the Detectives that Johnson had no right to consent to a search of the Residence, the Court does not find this testimony credible.

Although not specifically challenged by Defendant, the Court also finds that Johnson's consent was voluntary.  Although under arrest at the time, he had been advised of his rights under <u>Miranda</u>.  He is an adult and appeared to understand what was being said.  He also signed a written consent to search which acknowledged that the consent was voluntary, and that no threats or promises had been made to obtain his consent.  Govt. Ex. A.

Even if Johnson lacked actual authority to give valid consent to search, it was reasonable for the Detectives to believe that he possessed authority to consent.  As set forth above, he had advised the Detectives that he lived at the Residence, and they had seen him enter and leave the Residence that night.  Ms. Berry-Hill had also advised the Detectives that Johnson was her husband, had just left the residence, and was returning. Johnson executed a written consent to search the Residence, never suggesting he lacked authority, and the Court also finds that Ms. Berry-Hill did not suggest that Johnson lacked such authority until the following day.  As such, at a minimum, Johnson had apparent authority to consent to the search.

The Detectives were also justified, on these facts, in believing that Ms. Berry-Hill was also consenting to a further search of the Residence for narcotics and other drug-

related items. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). Although she asked the Detectives whether they had a search warrant, this did not amount to a refusal to grant consent.[4] And she did not further question the search when shown Johnson's written consent to search or attempt to stop the search. See United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998) ("the Fourth Amendment requires only that the police reasonably believe the search to be consensual."); United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) (withdrawal of consent must be made by unequivocal act or statement). On these facts, the Detectives were thus reasonable in believing that Ms. Berry-Hill also agreed to the search when advised of Johnson's consent. Accordingly, the narcotics, firearms, cash, cell phones, and other items seized from the Residence are not subject to seizure.

### C. Statements Made by Defendant

Defendant seeks to suppress the oral statements he made, that the statements were not voluntary and were the product of coercion. A defendant may knowingly and

---

[4] In Georgia v. Randolph, 547 U.S. ___, 126 S.Ct. 1515, 1526 (2006), the Supreme Court held that consent to search by one homeowner is not valid as to another, when the other homeowner is present and expressly refuses to give consent. That case has no application here. In Randolph, the Supreme Court expressly refused to reach the constitutionality of a search as to a third person – such as Defendant Moore – where one co-tenant consents to the search while another co-tenant objects. Id. at 1526 n.8, 1536. In any event, the Court finds as a factual matter that Ms. Berry-Hill acceded to the search when shown the consent to search by Johnson.

intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  Moran v. Burbine, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Connelly, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare."  Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).  See Dickerson, 530 U.S. at 444.

Here, Defendant Moore was orally advised of his rights under Miranda prior to making any statements at the Residence.  He was 23 years old at the time and appeared to understand what was being said.  Defendant also had been arrested before and had prior

experience with law enforcement. Although Defendant was under arrest and in handcuffs, at the time there were only two officers with Defendant, they did not have their weapons displayed, and no promises or threats were made to induce his statements at the scene. Indeed, Defendant appeared anxious to try and clear his mother and sisters. As such, the statements made by Defendant at the Residence are not subject to suppression.

At the precinct, Defendant was again advised of his rights under <u>Miranda</u>, and he agreed once again to speak to the Detectives. The interview that followed was conducted by only two Detectives, and they did not make any promises or threats to induce either the waiver or Defendant's statements. Based on the totality of the circumstances, the Court also finds Defendant knowingly and voluntarily waived his rights at the precinct and made a voluntary oral statement.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 20] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. No. 21] be **DENIED.**

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may

result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d

356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 18th day of July, 2006.